EXTERIOR SYSTEMS, INC. d/b/a Fab-wel, Inc., a wholly-owned subsidiary of Fibreboard, Inc., a wholly-owned subsidiary of Owens Corning, Plaintiff,

v.

NOBLE COMPOSITES, INC., Larry Farver, Kenneth Farver, and Edward Welter, Defendants.

No. 3:01–CV–217–RM.

United States District Court, N.D. Indiana, South Bend Division.

Dec. 4, 2001.

Paul J. Peralta, Eric J. Groen, Alison G. Fox, Baker and Daniels, South Bend, IN, for Plaintiff.

John D. Ulmer, Yoder, Ainlay, Ulmer and Buckingham, Goshen, IN, for Defendants.

Cynthia S. Gillard, Michaelle C. Hilary, Warrick and Boyn, Elkhart, IN, for Edward Welter.

### MEMORANDUM AND ORDER

NUECHTERLEIN, United States Magistrate Judge.

Plaintiff Exterior Systems, Inc. d/b/a Fabwel, Inc. ("ESI") seeks to disqualify counsel for Defendant Edward Welter. After reviewing all of the evidence (both in-camera and non-in-camera), the Court concludes that Attorney Cynthia Gillard's current representation of Welter conflicts with her past representation of Fabwel. Consequently, ESI's motion to disqualify counsel is **GRANTED.**

### I. FACTUAL BACKGROUND

Defendant Welter's present counsel, Cynthia Gillard, is a member of a firm, Warrick & Boyn, that has represented Welter since 1972. In that year, Welter founded Fabwel, Inc. ("Fabwel") as an Indiana corporation that made fiberglass panels used in recreational vehicles. Welter served as Fabwel's majority shareholder, president and chief executive officer until he sold the company to ABF Investors, Inc. ("ABF") in 1987. Welter continued as president and chief executive officer of Fabwel under ABF's ownership. Warrick & Boyn continued to serve as counsel for Fabwel. As part of this representation, Attorney Gillard represented Fabwel in the purchase of Master Fab, Inc., a company owned and controlled by Defendant Larry Farver. Gillard prepared numerous contracts and other acquisition documents on behalf of Fabwel, including a February 10, 1988 non-competition/non-disclosure agreement between Fabwel and Larry Farver.

In 1985, Welter established the Executive Benefit Plan for executives of Fabwel. The initial plan used life insurance policies and forms supplied by a local Elkhart insurance agent. Fabwel supplemented the life insurance policies with its own funds held in trust. The Plan consisted of a series of separate agreements with individual Fabwel executives, including Welter. On June 11, 1990, Gillard drafted an amended Plan agreement between Fabwel and Welter. The 1990 amendment completely terminated and replaced the initial 1985 agreement.

In July 1992, Welter and twenty other minority investors bought Fabwel back from ABF. Among the twenty minority employee investors were Raymond Stout, ESI's current President; Larry Farver, a Defendant and current investor in Defendant Noble Composites; and John Gardner, Fabwel's Chief Financial Officer until 1999 when he left and became a shareholder of Noble Composites. Welter continued as chairman of the board of directors and chief executive officer of Fabwel. Welter's counsel, including Ms. Gillard, continued as counsel for Fabwel.

In 1994, Attorney Gillard represented Fabwel in its initial public offering. In 1994 and 1995, she assisted Fabwel with its purchase of ITI Tuco, Inc. She prepared non-competition/non-disclosure agreements on behalf of Fabwel in conjunction with the ITI acquisition.

Welter and the other shareholders sold Fabwel to Fibreboard Corporation on May 5, 1997. On that day, Welter signed a consulting and non-competition/non-disclosure agreement with Fabwel. Welter and Fabwel also signed a May 5, 1997 amendment to the Executive Benefit Agreement. Gillard represented Welter and some of the other shareholders during these transactions, including Stout, Gardner, and Larry Farver. On May 22, 1997, Fabwel and Welter signed a second non-competition agreement. The second agreement enabled Welter to receive early retirement benefits as described by the Executive Benefit Agreement. Gillard represented Welter during this transaction.

In June 1997, Owens Corning bought Fibreboard and thus Fabwel. In December 1999, Owens Corning merged Fabwel into ESI, which is a subsidiary of Fibreboard, which is a subsidiary of Owens Corning. Fabwel, Inc., the Indiana corporation, ceased to exist. Fabwel is now operated as a division of ESI.

ESI receives legal advice from Owens–Corning's in-house counsel. When necessary in-house counsel hires outside law firms on particular matters. Since the May 1997 sale, Owens–Corning has hired Warrick & Boyn on three matters, all unrelated to the present dispute. In November 1997 Owens Corning asked for a copy of the Indiana statute relating to bribery, blackmail, and extortion. In January 2000 Owens–Corning contacted Warrick & Boyn about a possible collections case that was never filed. Finally, in March 2000 Warrick & Boyn appeared in Elkhart Superior Court in a case involving a fire at Fabwel in 1998. The suit was settled and dismissed in June 2001.

In April 2000, Larry Farver, ESI's general manager, resigned and formed Noble Composites, Inc. with several other investors including, allegedly, Welter. ESI alleges that Noble Composites manufactures the same product as ESI and competes directly against it. Further, ESI alleges that Larry Farver and Welter breached their non-competition/non-disclosure agreements and raided ESI's workforce. In October 2000, ESI terminated the Executive Benefit Plan and allegedly stopped paying Welter early retirement benefits.

ESI filed suit in March 2001 claiming breach of the non-competition/non-disclosure agreements, misappropriation of trade secrets, intentional interference with employment relationships, and other claims. Defendants filed a motion to dismiss for lack of subject matter jurisdiction, which delayed matters for several months before the Court denied the motion. Defendants filed their answers in June 2001. They alleged counterclaims of abuse of process, unfair competition, and other antitrust claims. In addition, Welter sought a judgment declaring the May 22, 1997 non-competition/non-disclosure agreement to be null and void once ESI stopped paying Welter's early retirement benefits in breach of the Executive Benefit Agreement.

This Court has the authority to decide this motion pursuant to 28 U.S.C. § 636(b)(1)(A) and the June 12, 2001 order of referral.

## II. DISQUALIFICATION IS WARRANTED IF AN ATTORNEY'S REPRESENTATION FAILS THE SUBSTANTIAL RELATIONSHIP TEST

The critical importance of two considerations, the sacrosanct privacy of the attor-

ney-client relationship and the prerogative of a party to proceed with counsel of its choice, requires a court to proceed with careful and thoughtful analysis when deciding motions to disqualify counsel. *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983).

The Seventh Circuit warns that disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Board of Educ.*, 17 F.3d 1059, 1066 (7th Cir.1994) (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)). Disqualification motions "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman*, 689 F.2d at 722. Yet, the Seventh Circuit has instructed courts to resolve doubts in favor of disqualification. *United States v. Goot*, 894 F.2d 231, 235 (7th Cir.1990).

The Local Rules of the United States District Court for the Northern District of Indiana adopt Indiana's version of the Model Rules of Professional Conduct. N.D.Ind.L.R. 83.5(f). Indiana Rule of Professional Conduct 1.9 states as follows:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known.

Subsection (a) addresses the problem of attorney loyalty; subsection (b) deals with client confidences. Subsection (a)'s loyalty requirement extends beyond situations where client confidences are actually learned and used, but the duty of loyalty does not extend to the point of never allowing an attorney to take a position adverse to a former client. Subsection (a) extends the duty of loyalty to situations where it reasonably can be inferred that the attorney learned related confidences during the prior representation on a "substantially related matter."

In addition to the Indiana rule, the Seventh Circuit has adopted a federal common law standard for attorney disqualification. That standard, derived from the venerable *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953), and followed by every jurisdiction in the United States, is known as the "substantial relationship" test:

[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are *substantially related* to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communication be maintained.

*Id.* at 268–69. Like Rule 1.9, the rule in *T.C. Theatre* sought to enforce (1) "the lawyer's duty of absolute fidelity" and (2) protection of "privileged communications" with former clients. Rule 1.9 is merely a codification of the *T.C. Theatre* test.

The Seventh Circuit's inquiry under the "substantial relationship" test is as follows:

First, the trial judge must make a factual reconstruction of the scope of the

prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252, 255–56 (7th Cir.1983) (citing *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir.1978)).

■ Once a substantial relationship has been found, it is irrebuttably presumed that counsel had access to confidential information. *Monon Corp. v. Wabash Nat'l Corp.,* 764 F.Supp. 1320, 1323 (N.D.Ind. 1991) (Sharp, J.). "[W]here a law firm which received confidences from one client now represents a second client in a substantially related matter and those clients now oppose each other, the presumption that the confidences were shared becomes irrebuttable and the law firm must be disqualified." *Flo–Con Systems, Inc. v. Servsteel, Inc.,* 759 F.Supp. 456, 459 (N.D.Ind.1990) (Lozano, J.).

The Seventh Circuit has discussed three purposes behind the substantial relationship test: (1) to prevent disclosure of client confidences, *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983) (noting that "a lawyer is prohibited from using confidential information that he has obtained from a client against that client on behalf of another one"); (2) to protect a client's interest in the loyalty of counsel, *id.* at 1269 (stating that a client has "a right not to see [its lawyer] reappear ... on the opposite side of a litigation"); and (3) to prevent the "unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public—or for that matter the bench and bar," *id.*

## III. ATTORNEY GILLARD IS DISQUALIFIED BECAUSE HER PAST REPRESENTATION OF FABWEL IS SUBSTANTIALLY RELATED TO HER CURRENT REPRESENTATION OF WELTER AGAINST FABWEL AND THE *ALLEGAERT* EXCEPTION DOES NOT APPLY

### A. Attorney Gillard's Past Representation of Fabwel is Substantially Related to Her Current Representation of Welter Against Fabwel's Successor, ESI

■ As explained in the factual background, Attorney Gillard and her firm have provided extensive legal counsel for both Mr. Welter and Fabwel. That past representation included Attorney Gillard's preparation of non-competition/non-disclosure agreements on behalf of Fabwel, including Defendant Larry Farver's agreement. She also prepared a replacement Executive Benefit Agreement between Fabwel and Welter in 1990.

In 1997, though, Attorney Gillard represented the shareholders of Fabwel in their sale of the company to Fibreboard. As part of the sale, she negotiated an amendment to the Executive Benefit Plan on behalf of Welter and the other shareholders. She also represented Welter when he signed two non-competition/non-disclosure agreements in 1997.

It is reasonable to infer that Fabwel provided Attorney Gillard with confidential information when she prepared the non-competition/non-disclosure agreements and the 1990 Executive Benefit Agreement on its behalf. By preparing both agreements, Attorney Gillard must have known Fabwel's reasons for wanting such agreements, Fabwel's concerns with entering into such agreements, and the interests of Fabwel at stake under each agreement. Good attorneys, such as Ms. Gillard, learn

as much as they can about their client's motives, concerns, and interests before drafting documents that will legally bind the client. Good attorneys raise legal issues with their clients and discuss ways to address those issues. When preparing the agreements in this case, Attorney Gillard chose words and phrases designed to protect Fabwel's interests as she understood them. Confidential, attorney-client-protected information must have been exchanged.

The present suit involves matters related to Attorney Gillard's past representation of Fabwel. The starkest example of this relationship is the 1990 Executive Benefit Agreement. Welter's counterclaim alleges that ESI breached the Executive Benefit Agreement (the 1990 plan plus the 1997 amendment). The counterclaim attaches a copy of the 1990 agreement, the one prepared by Gillard on behalf of ESI's predecessor, Fabwel. In simple terms, Attorney Gillard's current client is suing the successor to her former client on a contract she created on behalf of her former client. This conflict, separate from any other potential conflicts, is sufficient to warrant disqualification of Gillard.

Welter argues that all of the issues in this case relate only to the agreements made as part of the 1997 sale of Fabwel, at a time when Gillard represented the interests of Welter and the other shareholders against those who would soon take over Fabwel. Specifically, he argues that ESI breached a provision in the 1997 amendment to the Executive Benefit Plan, but not a provision in the 1990 agreement. Such a distinction is not tenable in light of the allegations in Welter's counterclaim. The counterclaim alleges a breach of both the 1990 agreement and the 1997 amendment. Counterclaim ¶ 6. It alleges that ESI stopped making "Early Retirement payments" to Welter. *Id.* ¶ 5. The amount of the Early Retirement Benefit (*i.e.,* Welter's alleged damages, *see* Counterclaim ¶ 7) is defined in Article I of the 1990 agreement. Welter attached the 1990 agreement to his counterclaim because it is essential, not just related, to the allegations in his counterclaim. Welter's counterclaim against ESI relates directly to a document prepared by his counsel on behalf of ESI's predecessor, Fabwel.

Attorney Gillard's second conflict is not as direct. She represented Fabwel when she drafted Larry Farver's non-competition/non-disclosure agreement. ESI is now suing Farver based on that agreement. ESI alleges that Welter and Larry Farver are working together in violation of their non-competition/non-disclosure duties to ESI. While this fact is disputed, it would not be unreasonable in this case to assume that Gillard is cooperating with Farver's counsel in the defense of this case. But whether or not that is occurring is not essential to the resolution of this motion.

Also, ESI alleges that Welter breached his non-competition/non-disclosure agreement. The interests that ESI sought to protect with this agreement are similar to the interests Fabwel sought to protect when it hired Gillard to prepare non-competition/non-disclosure agreements on behalf of Fabwel. Gillard's exposure to Fabwel's confidential interests and concerns when drafting these agreements is likely to inform her defense of Welter against ESI's claims.

In sum, Gillard's current representation of Welter is directly related to the 1990 Executive Benefit Agreement, which she drafted on behalf of Fabwel. Standing alone, this is sufficient to warrant disqualification. The Court also has strong concerns about Gillard's past representation of Fabwel with respect to non-competition/non-disclosure agreements. This second area of conflict bolsters the Court's

conclusion that Gillard's current representation of Welter fails the substantial relationship test.

### B. *Allegaert* is Not an Exception to the Substantial Relationship Test under the Facts of This Case

■ Welter argues that the substantial relationship test does not apply in this case according to the exception stated in *Allegaert v. Perot*, 565 F.2d 246 (2d Cir.1977), and its progeny. *Allegaert* described a situation where a lawyer continuously represented a primary client, but then accepted joint representation with a secondary client. Later, the interests of the two clients diverged on matters relating to the joint representation. *Allegaert* held that the lawyer could continue to represent the primary client against the secondary client because the secondary client "necessarily knew that information given to [the lawyers] would certainly be conveyed to their primary clients." *Id.* at 250. The substantial relationship test was "inapposite" because the secondary client had no expectation that the information acquired by the lawyers would be kept secret from the primary client. *Id.* Since the lawyers had maintained a "continuous and unbroken legal relationship with their primary clients," they "have not changed sides from a former client to a current, adverse client." *Id.* at 251.

Applied to this case, Welter argues that at all times he was the primary client. Attorney Gillard represented Fabwel, Inc. when it existed under Welter's ownership or control, but Welter himself directed and guided Fabwel, Inc.'s relationship with its lawyer. Thus, Welter knew all of Fabwel's confidential communications with its lawyer Gillard because he was the person communicating them on behalf of Fabwel. Fabwel, Inc., the secondary client, had no reasonable expectation that its confidential attorney communications would not be shared with Welter, the primary client and

Fabwel's CEO. Thus, Attorney Gillard has not switched sides. She has always represented Welter and continues to represent him. Fabwel, Inc. no longer exists, and ESI can claim no confidential communications that Welter himself does not already know and would use to his benefit regardless of his chosen counsel.

The Seventh Circuit has not addressed the "*Allegaert* doctrine," nor the situation described by *Allegaert*. Few circuits have. The Ninth and District of Columbia Circuits adopted *Allegaert* in *Christensen v. U.S. District Court for the Central District of California*, 844 F.2d 694 (9th Cir.1988), and *National Souvenir Center, Inc. v. Historic Figures, Inc.*, 728 F.2d 503 (D.C.Cir. 1984).

The Fifth Circuit, although not mentioning *Allegaert*, took the opposite view in an arguably similar situation in *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168 (5th Cir.1979). *Brennan's* involved an attorney who had represented the Brennan family with respect to their business interests, a series of restaurants in New Orleans and other southern locations. The family jointly owned the restaurants as several distinct corporate entities. The Brennans chose the attorney to represent their business as a whole and all of the corporations paid a pro rata share of the attorney's retainer. The attorney managed most legal matters for the family business including the registration of trademarks.

A dispute arose in the Brennan family over the operation of the business. The family resolved the dispute by carving out one of the family corporations and giving it to the opposing group of family members for them to run separately. Soon, though, the two factions were at odds over certain trademark rights. The attorney sided with the larger group of family members against those who had seceded.

The smaller family group moved to have the attorney disqualified. The district court granted the motion, and the Fifth Circuit affirmed. The court of appeals rejected the attorney's argument that he had previously represented all family members jointly, and thus, they could not have expected any of their communications to be kept confidential from other family members. The court held that "[t]he need to safeguard the attorney-client relationship is not diminished by the fact that the prior representation was joint with the attorney's present client." *Id.* at 172. It reasoned that information obtained in confidence

> is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it.... A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same manner.

*Id.* The purpose of the substantial relationship test extended beyond protection of client confidences to a more general duty of loyalty to clients: "The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys." *Id.* Since the attorney had previously represented the smaller family group on matters substantially related to the dispute before them, the court of appeals affirmed the district court's order disqualifying the attorney from representing the larger family group. *Id.*

Many scattered district court opinions have addressed the *Allegaert* doctrine with inconsistent results. In our own circuit, two recent decisions demonstrate this divergence in authority. *Gen–Cor, LLC v. Buckeye Corrugated, Inc.*, 111 F.Supp.2d 1049 (S.D.Ind.2000) (Barker, C.J.), refused to disqualify Attorney Paul J. Peralta of Baker & Daniels [1] using the same reasoning as, but not mentioning, *Allegaert*. Attorney Peralta represented plaintiffs Gen–Cor and Russell Stooks, the former owner of Cra–Gen, Inc., which was itself the sole owner of Cra–Wal, Inc. The suit alleged breaches of contracts associated with the sale of Cra–Gen and Cra–Wal from Stooks to defendant Buckeye Corrugated, Inc. Specifically, plaintiffs alleged that Buckeye failed to use its best efforts to maximize Cra–Wal's profits, failed to keep accurate accounting records, and intentionally understated Cra–Wal's earnings, among other things.

When Stooks owned Cra–Gen and Cra–Wal, Baker & Daniels represented Stooks, Cra–Gen, and Cra–Wal jointly. During the negotiations for the sale of Cra–Gen and Cra–Wal to Buckeye, Baker & Daniels represented Stooks and another firm represented Buckeye. After the sale Baker & Daniels continued to represent Cra–Wal on certain employment and collection matters.

The court held that Baker & Daniels had violated Indiana Rule of Professional Conduct 1.7, which applies to conflicts of interest between current clients, but concluded that disqualification was not an appropriate remedy. Its analysis of the disqualification issue borrowed the "substantial relationship test" from Rule 1.9. The court recognized that, prior to the sale of the company to Buckeye, Baker & Daniels had received confidential information from Cra–Wel. The court discounted this relationship, though, because Cra–Wel was not owned by Buckeye at the time.

> However, up until the sale, Cra–Gen and Cra–Wel were owned entirely by Stooks, so Stooks would have had access to (and control over) Cra–Wal's [confidential in-

---

1. Mr. Peralta represents ESI, the party seeking disqualification, in this matter.

formation]. Baker & Daniels could not have learned anything through its representation of Cra–Wel not already known to Stooks.

*Gen–Cor*, 111 F.Supp.2d at 1056. The court found that Baker & Daniels's postsale representation of Cra–Wal was for matters unrelated to the matter at hand. *Id.* at 1056–57.

Thus, Baker & Daniels had taken a position adverse to a client (i .e., Attorney Peralta had not been loyal to Cra–Wal). Nonetheless the court refused to disqualify Attorney Peralta from representing Stooks against Buckeye because Cra–Wal had new owners and any of its confidences learned by Baker & Daniels would have been known by Stooks.

In contrast with *Gen–Cor*, *Securities Investor Protection Corp. v. R.D. Kushnir & Co.*, 246 B.R. 582 (Bankr.N.D.Ill.2000), disqualified an attorney on the basis of the substantial relationship test. *Securities Investor Protection* criticized the *Allegaert* exception to the substantial relationship test and held that *Allegaert* did not apply to jurisdictions that had adopted the Model Rules of Professional Conduct:

> Ethical rules vary from jurisdiction to jurisdiction, but most embody either the ABA Model Code of Professional Responsibility or the ABA Model Rules of Professional Conduct. Opinions issued in jurisdictions such as this that have adopted the Model Rules have rejected *Allegaert* and its line of cases because *Allegaert* established precedent only under Canon 4 of the ABA Code of Professional Responsibility.... Those decisions concluded that the Second Circuit opinions in *Allegaert* only dealt with the issue of an attorney's duty to preserve confidential information under Canon 4

whereas the Model Rule 1.9(a) offers much broader protection that extends beyond preservation of confidential information.

*Securities Investor Protection*, 246 B.R. at 589 (citations omitted). The bankruptcy court interpreted the Model Code to only protect client confidences while the Model Rules imposed a broader duty of loyalty:

> Rule 1.9 is not limited to situations where a former client would be harmed by the divulgence of confidential information. That Rule "imposes an ethical obligation irrespective of harm." ... [U]nder Model Rule 1.9 ..., the loyalty principle is an independent and sufficient basis for precluding a lawyer from accepting an adverse subsequent representation.

*Securities Investor Protection*, 246 B.R. at 589 (citations omitted). For this reason, the court disqualified the attorney.

This Court agrees that the Model Rules have superseded the Model Code in Indiana, but the distinction between the two does not provide adequate basis for rejecting *Allegaert*. Courts have applied the substantial relationship test, with its dual concerns for client loyalty and client confidences, before the existence of the Model Code, when states had it in effect, and after states replaced it with the Model Rules. The substantial relationship test from *T.C. Theatre* in 1953 (which was itself a summary of existing law) has not changed. Rule 1.9 merely codified the test.

Nonetheless, to apply *Allegaert* to the facts of this case would give insufficient weight to Attorney Gillard's duty of loyalty to Fabwel, which is now part of ESI. The *Allegaert* exception must necessarily be narrow[2] because it requires a finding that

---

**2.** *Allegaert* itself describes its holding as one based on "peculiar facts." *Allegaert,* 565

F.2d at 248.

one client is secondary to another, and thus, less worthy of an attorney's loyalty. In *Allegaert*, the secondary client was a large Wall Street brokerage firm that traditionally sought legal advice from its own law firm. The primary client was another brokerage firm controlled by H. Ross Perot that had entered into a joint venture with the secondary client. The primary client and the secondary client had separate counsel during the joint venture negotiations. Once the joint venture agreement was in place, though, lawyers for the primary client did some work for the secondary client, as anticipated by the joint venture agreement. Later, the secondary client filed for bankruptcy, and the trustee filed a claim against the primary client that was substantially related to the work done by the primary client's firm on behalf of the secondary client. The trustee sought to disqualify the primary client's law firm, but the court held that disqualification was not required.

The secondary client in *Allegaert* was secondary because the primary client's law firm only represented it with respect to a few matters following the joint venture agreement. The secondary client continued to seek legal advice from its own law firm, *Allegaert*, 565 F.2d at 250, *i.e.*, it was a primary client of another lawyer. The secondary client knew that on the few occasions when it sought legal advice from the primary client's lawyers, those lawyers would share the information with its joint venture partner, the primary client. The primary client had a longstanding relationship with its lawyers prior to the joint venture, which was likely to continue until long after the joint venture ended.

*Allegaert* turned on the court's belief that "the attorneys sought to be disqualified here have not changed sides from a former client to a current, adverse client." *Id.* at 251. One firm had always represented the primary client; the secondary client had always sought its primary legal advice from another firm. The secondary client accepted legal representation from the law firm of its joint venture partner with eyes wide open and knowing that its confidences would be shared. If the secondary client wanted confidential legal advice, it knew it had to seek it from its own primary lawyers.

In this case, by contrast, Fabwel was not Gillard's secondary client. Fabwel was a primary client concurrent with Welter. Gillard represented Fabwel on many substantial transactions, including its initial public offering and the acquisition of at least two other companies. From 1972 to 1987 and from 1992 to 1997, Warrick & Boyn were Fabwel's only counsel. Even when ABF Investors or ESI owned Fabwel, Gillard performed some work on behalf of Fabwel. To claim now that her representation of Fabwel was secondary to her primary representation of Welter ignores the longstanding relationship Gillard and Warrick & Boyn had with Fabwel in addition to their longstanding relationship with Welter.

Welter claims that his lawyer has not switched sides, that she has always represented him. In other words, Attorney Gillard has not been disloyal to Fabwel because Fabwel is no longer owned and controlled by Welter. This argument assumes that in addition to always sharing confidences, Welter and Fabwel were really one and the same person. It is true that, at various times, Welter was the majority shareholder, chairman of the board of directors, and chief executive officer of Fabwel. Fabwel, though, was not the mere alter ego of Welter. It was a separate and independent entity.

[A] corporation is a legal entity separate and distinct from its shareholders and officers.... This has been so since the earliest days of our corporate

law.... Chief Justice Marshall recognized that corporations had constitutionally protected contract rights. Thus, "[t]he corporate creature of the law—'invisible, intangible, and existing only in contemplation of law'—was endowed with basic legal rights, even against its creator." ...

*Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1231–32 (Ind.1994) (citations omitted) (refusing to disregard the corporate form and to hold majority shareholder and president of corporation liable). Welter offers no evidence, nor could he, that Fabwel was merely his alter ego, or was somehow not entitled to its attorney's loyalty separate from the attorney's loyalty to Welter.[3]

The fact that Welter and Fabwel always shared confidences does not adequately address an attorney's duty of loyalty. The duty of loyalty goes beyond the duty not to disclose confidences. It is a duty not to turn on the person a lawyer has previously represented. In this case, Fabwel and its successor are a separate entity entitled to the loyalty of its lawyers as a primary client. *Allegaert* is distinguishable on its facts.

### C. ESI has not Waived its Right to Move to Disqualify

■ Defendants argue that Plaintiff waited too long before moving to disqualify counsel. A former client's ability to seek disqualification of its adversary's attorney can be waived if the former client knew of its attorney's representation of an adversary, but failed to raise its objection promptly. *E.g., Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 731 (11th

Cir.1988); *Trust Corp. MT v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983); *Central Milk Producers Co-op. v. Sentry Food Stores*, 573 F.2d 988, 992 (8th Cir. 1978); *Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir.1975).

■ When determining whether a party has waived its objections, courts must consider the following: 1) the length of the delay in bringing the motion to disqualify; 2) when the former client learned of the conflict; 3) whether the former client was represented by counsel during the delay; 4) why the delay occurred; and 5) whether the delay would result in prejudice to the nonmoving party.

■ The Court finds no waiver in this case. Plaintiff objected to any potential representation of Welter by Gillard before it filed suit. Plaintiff filed its complaint on March 15, 2001. Defendants responded with a motion to dismiss that challenged the Court's jurisdiction to hear the case based on lack of diversity. Codefendants filed an appeal to the Seventh Circuit of an order granting some additional time to answer the complaint, but not as much as Codefendants requested. All scheduling and discovery issues were postponed while the Court resolved the jurisdictional challenges. The Court decided that it had diversity jurisdiction on June 14, 2001.

On June 25, 2001, Defendant Welter filed his Answer with Counterclaim. The counterclaim asserted ESI's breach of the Executive Benefit Agreement for the first time. Plaintiff filed an answer to the counterclaim on July 31, 2001. In the meantime, counsel commenced discovery and scheduling matters.

---

**3.** The existence of minority shareholders distinguishes this case from *Gen–Cor*, where the individual, Stooks, was the sole owner of Cra–Gen and Cra–Wal before their sale to Buckeye. *Gen–Cor*, 111 F.Supp.2d at 1056. This factual difference, though significant, may not fully justify a different result in this case. However, it is this Court's opinion that *Gen–Cor* did not give sufficient weight to the attorney's duty of loyalty, as an additional duty independent from the duty not to disclose confidences.

On August 21, 2001, Plaintiff filed its Motion to Disqualify Counsel. Plaintiff filed its motion less than one month after the pleadings closed on this matter. It filed the motion less than two months after learning of the counterclaim, which included the most direct violation of the substantial relationship test. Before the counterclaim, the substantial relationship test arguably did not apply to prevent Gillard from representing Welter. Welter's counterclaim involved the clearest instance of Gillard's switching sides and representing Welter on a contract that she had drafted in 1990 for Fabwel. Finally, Plaintiff filed its motion slightly more than two months after it learned that the Court would exercise jurisdiction in this case.

A delay of approximately two months after the Court decided it had jurisdiction and Welter filed his counterclaim is not long enough to constitute waiver. No case has found waiver based on a two-month delay. Furthermore, the small delay in bringing the motion prejudices ESI as much as, if not more than, Welter because ESI is trying to reach a preliminary injunction hearing as soon as possible. This case has not been set for trial and is still in its early stages. To alleviate prejudice to Welter, the Court can grant his new counsel extra time to become familiar with the case. ESI has not waived its right to seek disqualification.

## IV. CONCLUSION

The Court has reached its decision to disqualify counsel in the face of unclear and conflicting precedents, each presenting unique factual situations that are, in some aspects, similar and dissimilar to the facts in this case. In this uncertain area, Warrick & Boyn and Ms. Gillard cannot be fairly criticized for ethical insensitivity as there are good arguments to suggest that there is no impropriety in Warrick & Boyn's continued representation of Welter. The Court is very reluctant to sever the longstanding relationship between Warrick & Boyn and Welter and to deny Welter his counsel of choice in this case. Nonetheless, the Court is convinced that under the unique facts of this case, the Indiana Rules of Professional Conduct 1.9 and the application of the "substantial relationship" test require the disqualification of Ms. Gillard and Warrick & Boyn as counsel for Defendant Welter.

For the foregoing reasons, ESI's Motion to Disqualify Counsel for Edward Welter [Doc. No. 83] is **GRANTED**. All matters in this case are stayed until January 4, 2002, so that Defendant Welter may obtain new counsel and his counsel may become familiar with the case.

**SO ORDERED.**