**Paul D.S. EDWARDS, Plaintiff,**

v.

**360° COMMUNICATIONS, dba Alltel Corporation, et al., Defendants.**

**No. CV–S–98–1493–PMP (RJJ).**

United States District Court,
D. Nevada.

Oct. 21, 1999.

Craig B. Friedberg, Las Vegas, NV, for plaintiff.

Elayna J. Youchah, Schreck Morris, Las Vegas, NV, for defendants.

*ORDER*

PRO, District Judge.

Presently before this Court is Defendant 360° Communications' Motion to Disqualify (# 22), filed on July 28, 1999. Plaintiff Paul S. Edwards filed an Opposition (# 28) on

August 30, 1999. Defendant 360° Communications filed a Reply in Support of its Motion to Disqualify (# 36) on September 30, 1999. On October 4, 1999, the Court conducted a hearing regarding Defendant's Motion.

## I. FACTS

On October 20, 1998, Plaintiff filed pro per the instant lawsuit against Defendant, a subsidiary of the Alltel Corporation. Plaintiff sought more than five million dollars in damages for alleged violations of provisions of the federal Fair Credit Report Act, 15 U.S.C.A. § 1681, the Equal Credit Opportunity Act, 15 U.S.C.A. § 1691e, Regulation B, 12 C.F.R. § 202.14, and various analogous state statutes.

On or about November 10, 1998, Defendant retained the law firm of Rawlings, Olson, Cannon, Gormley & Desruisseaux ("Rawlings Olson") to represent and defend it from Plaintiff's suit. Rawlings Olson served as defense counsel until May 17, 1999, when the law firm of Schreck Morris was substituted in as counsel.

Plaintiff's current counsel, Craig B. Friedberg, was employed as an attorney by Rawlings Olson from June 21, 1993, until April 26, 1999. Thus, Friedberg was associated with Rawlings Olson for all but one month of the firm's representation of Defendant. During this period of time, Rawlings Olson performed various pretrial tasks, ranging from the drafting of answers to Plaintiff's Complaint to the service of dispositive motions. The evidence before the Court establishes, however, that Friedberg was never involved in the representation of Defendant. Two months after terminating his employment with Rawlings Olson and entering solo private practice, Friedberg agreed to substitute himself as the attorney of record for Plaintiff on June 16, 1999. Both parties agree that Friedberg is now involved in the same dispute in which Rawlings Olson had formerly provided representation.

Defendant brings the instant Motion to Disqualify on the grounds that Friedberg's retention constitutes a violation of the Nevada Rules of Professional Conduct. Specifically, Defendant contends that while it may

lack evidence that Friedberg actually acquired confidential client information, Friedberg should nevertheless be disqualified since any knowledge held by one partner within Rawlings Olson should be imputed to the remaining members of the firm. In order to "ensure confidence in the integrity of our legal institutions," Defendant asks this Court to apply a standard of per se attorney disqualification in cases where a lawyer's former law firm represented a person materially adverse to that lawyer's present client in the same or a substantially similar matter.

Friedberg responds that he should be judged not under a strict standard of presumed confidence sharing, but under a rebuttable standard propounded by the commentary to the latest version of the American Bar Association ("ABA") Model Rules of Professional Conduct. Under this standard, Friedberg contends that submitted declarations and affidavits make clear that his further involvement in this dispute would do no harm to the standards of professional ethics.

## II. NEVADA RULES OF PROFESSIONAL CONDUCT

In Nevada, legal representation creates a fiduciary relationship between attorney and client. *See, e.g., Achrem v. Expressway Plaza Ltd. Partnership*, 112 Nev. 737, 917 P.2d 447, 449 (1996); *Cook v. Cook*, 112 Nev. 179, 912 P.2d 264, 266 (1996); *Williams v. Waldman*, 108 Nev. 466, 836 P.2d 614, 618 (1992). The dimensions of these fiduciary duties have found expression, in part, in the codes of ethical conduct for attorneys.

Attorney behavior within the District of Nevada is governed by the ABA Model Rules of Professional Conduct, "as adopted and amended from time to time by the Nevada Supreme Court, except as such may be modified by this [federal district] court." *See* Local Rule 10–7. This amended corpus of rules is referred to collectively as the Nevada Rules of Professional Conduct. *See* Nev.Sup. Ct.R. 150(1). While the preamble and comments to the ABA Model Rules have not been adopted by the Nevada Supreme Court, they may nevertheless be "consulted for guidance in interpreting and applying" the

Nevada Rules of Professional Conduct. Nev. Sup.Ct.R. 150(2).

## III. DISCUSSION

In Nevada, a lawyer who has represented a client in a prior matter is barred from subsequently representing another person whose interests are materially adverse to the interests of the former client in the "same or substantially related matter." Nev.Sup.Ct.R. 159. A lawyer also may not reveal "information relating to representation of a client unless the client consents after consultation," except when necessary to prevent bodily harm or establish a claim or defense in subsequent litigation between the lawyer and the client. Nev.Sup.Ct.R. 156. Here, the parties do not dispute that Friedberg was a member of Rawlings Olson from the time his former firm was retained by Defendant until just one month before he accepted representation of Plaintiff in the same litigation. The parties do dispute, however, whether Friedberg can avoid disqualification by presenting evidence that he did not directly participate in Rawlings Olson's representation of Defendant during his association with that firm or acquire any knowledge of confidential information.

Resolution of this matter requires this Court to answer the following questions: (A) In Nevada, is the doctrine of imputed disqualification applicable to a solo practitioner who did not actually represent a client serviced by the practitioner's former law firm? (B) If so, do the Nevada Rules of Professional Conduct utilize a conclusive or rebuttable presumption of confidence sharing?

### A. Applicability of Shared Confidence Doctrine

██ The first issue is whether Friedberg, under a strict reading of the Nevada rules, should be imputed with the knowledge of Defendant's confidential client-attorney communications from his tenure at Rawlings Olson, regardless of whether any information was actually acquired. The doctrine of imputed disqualification flows from the belief that client confidences and legal matters are often discussed by attorneys working within the confines of the same law firm. *See, e.g.,*

*Kala v. Aluminum Smelting & Refining Co., Inc.,* 81 Ohio St.3d 1, 688 N.E.2d 258, 262 (1998); *State ex rel. Freezer Servs., Inc. v. Mullen,* 235 Neb. 981, 458 N.W.2d 245, 250 (1990). However a literal reading of the Nevada Supreme Court Rules suggests that Nevada does not even recognize the doctrine of shared confidences to situations like the one before this Court.

Both parties have initially cited Nevada Supreme Court Rule 160(2) which provides that:

> When a lawyer becomes associated with a *firm,* the *firm* may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 156 and 159(2) that is material to the matter.

Nev.Sup.Ct.R. 160(2) (emphasis added). Therefore, in Nevada, any confidential information actually acquired by an attorney in the course of employment at a prior law firm is imputed to the members of his new law firm. The Nevada Rules further provide that upon the "tainted" lawyer's termination of his association with the firm, the firm's remaining members are not thereafter barred from representing a person with interests materially adverse to those of a client represented by the tainted lawyer unless (1) the matter is the same or substantially related to that involving the tainted lawyer's representation of the client and (2) any of the firm's remaining lawyers still possesses the client's confidential information. *See* Nev. Sup.Ct.R. 160(3)(a)–(b).

Nevada Supreme Court Rule 160 does not, however, address the conceptually distinct issue of whether knowledge of confidential communications between a client and an attorney's former law firm should be imputed to an attorney who subsequently leaves the firm and demonstrates a complete lack of involvement with the client's representation. The remaining provisions of the Nevada rules seem to govern situations involving di-

rect client-attorney contacts and are of limited aid:

> A lawyer who has formerly *represented* a client in a matter shall not thereafter:
>
> 1. Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents, preferably in writing, after consultation; or
>
> 2. Use information relating to the representation to the disadvantage of the former client except as Rule 156 would permit with respect to a client or when the information has become generally known.

Nev.Sup.Ct.R. 159 (emphasis added). The term "representation" here seems limited to one-on-one, personal advocacy. Noticeably absent is any mention of the broader concept of the potential sharing of confidences during former employment within a law firm.

In contrast, ABA Model Rule 1.9, the basis for Nevada Supreme Court Rule 159, has tackled the issue head-on. This rule states, in pertinent part:

> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter *in which a firm with which the lawyer formerly was associated* had previously represented a client:
>
> (1) whose interests are materially adverse to that person; and
>
> (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client consents after consultation.
>
> (c) A lawyer who has formerly represented a client in a matter or *whose present or former firm* has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the

> information has become generally known; or
>
> (2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

ABA Model Rule 1.9(b)–(c) (emphasis added). The Nevada Supreme Court's refusal to adopt such language is telling. Where regulatory or statutory language is rejected by a promulgating body, its absence provides an indication that the body did not wish to have the issue considered. *See* Norman J. Singer, 2A Sutherland Statutory Construction § 48.04, at 325 (5th Ed.1992). It thus appears that in Nevada, an attorney who was not directly involved in a law firm's representation of a client cannot be imputed with actual knowledge of confidential information once that attorney resigns from employment with that firm.

Defendant vainly seeks a contrary interpretation based upon the case of *Ciaffone v. Eighth Judicial Dist. Court of the State of Nevada*, 113 Nev. 1165, 945 P.2d 950 (1997). There, the Nevada Supreme Court held that, since nonlawyer employees of law firms were subject to the same disqualification standards as lawyers, a paralegal who had worked on confidential matters for one law firm disqualified by imputation the second law firm to which she moved. *See id.* at 1168–69, 945 P.2d 950. The *Ciaffone* court further stated that:

> This does not mean that anytime a nonlawyer employee changes law firms that the new employer must be disqualified under SCR 160. First, if the nonlawyer employee never obtained confidential information as defined by SCR 156 and 159, no ethical problem arises requiring disqualification. Second, even if a nonlawyer employee had *access to privileged information*, SCR 160(4) provides that the former law firm and its client may waive disqualification if they are satisfied the present employer law firm is adequately screening the nonlawyer employee.

*Id.* at 955 n. 3 (emphasis added). Defendant contends that the latter statements regarding "access to privileged information" clearly implicate concerns about the acquisition of

shared confidences or information even by those completely uninvolved with the legal tasks performed by co-workers within the firm.

The Court's reading of the *Ciaffone* case, however, indicates that the Nevada Supreme Court was still addressing the issue of "access" only in terms of a personal, albeit reduced, involvement in the former representation. *See id.* at 950 (emphasizing that paralegal had served prior client in a "limited 'overflow' secretarial capacity"). Moreover, the cited language is mere dicta and does not constitute binding interpretive authority. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (disapproving of reliance on dicta from high court opinions). Accordingly, this Court finds it inappropriate to apply an imputed disqualification analysis upon uninvolved attorneys like Friedberg under a strict construction of the Nevada Rules of Professional Conduct. Denial of Defendant's motion is therefore proper on this basis alone.

### B. Applicable Presumptions Under the Nevada Rules of Professional Conduct

█ Even assuming *arguendo* the viability of imputed disqualification analysis to uninvolved attorneys in Nevada, this Court would deny Defendant's motion under commonly accepted presumptions and methods of proof. Jurisdictions which have adopted the ABA Model Rules have uniformly utilized the "substantial relationship" test to determine if a prior representation may conflict with a current representation adverse to the former client. *See e.g., Griffith v. Taylor,* 937 P.2d 297, 301 n. 8 (Alaska 1997); *In re Steveon R.A.,* 196 Wis.2d 171, 537 N.W.2d 142, 144–45 (1995); *Bergeron v. Mackler,* 225 Conn. 391, 623 A.2d 489, 494 (1993); *Maritrans GP Inc. v. Pepper,* 529 Pa. 241, 602 A.2d 1277, 1281–82 (1992); *In re Ockrassa,* 165 Ariz. 576, 799 P.2d 1350, 1352 (1990); *State ex rel. Nebraska State Bar Ass'n v. Douglas,* 227 Neb. 1, 416 N.W.2d 515, 548 (1987). Reference to this test is unnecessary in this case, though, since both parties agree that Friedberg has undertaken representation of an adverse party in a proceeding identical to the one in

which Rawlings Olson had previously provided representation. Nonetheless, the parties differ as to what presumptions the Court should draw from this characterization. This is a matter of first impression in Nevada.

Defendant argues that Nevada would most likely utilize California's irrebuttable presumption standard, which directs courts to conclusively presume that an attorney learned confidential, material information in the course of a prior representation if the two matters are substantially related. *See, e.g., Rosenfeld Const. Co. v. Superior Court,* 235 Cal.App.3d 566, 286 Cal.Rptr. 609, 615 (1991); *H.F. Ahmanson & Co. v. Salomon Bros., Inc.,* 229 Cal.App.3d 1445, 280 Cal. Rptr. 614, 618 (1991). To this end, Defendant relies upon the decision of *Trone v. Smith,* 621 F.2d 994, 999 (9th Cir.1980), which supported a per se rule of disqualification on the grounds that it actuated canons of the ABA Model Code of Professional Responsibility, such as those addressing the maintenance of professional integrity and the avoidance of the mere appearance of impropriety. Defendant also cites cases like *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.,* 809 F.Supp. 1383 (N.D.Cal.1992) and *Carlson v. Langdon,* 751 P.2d 344 (Wyo. 1988), which eschewed any demonstrations of actual knowledge for the additional reason that a requirement of proof would inevitably tear aside the protective cloak encircling the client-lawyer relationship.

Members of the legal profession, including judges, should rightly be cognizant of and concerned about the appearance of impropriety associated with their conduct. Notwithstanding these concerns and the authorities cited by Defendant, this Court declines to apply a conclusive presumption of shared confidences to the facts of this case. The appearance of impropriety position extolled in *Trone* has been specifically discredited by the new ABA Model Rules. *See Waters v. Kemp,* 845 F.2d 260, 265 n. 12 (11th Cir. 1988). Commentary to the latest version of the rules explains that:

> The ... rubric formerly used for dealing with disqualification is the appearance of impropriety proscribed in Canon 9 of the

ABA Model Code of Professional Responsibility. This rubric has a twofold problem. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since "impropriety" is .undefined, the term "appearance of impropriety" is question-begging. It therefore has to be recognized that the problem of disqualification cannot be properly resolved either by simply analogy to a lawyer practicing alone or by the very general concept of appearance of impropriety.

ABA Model Rule 1.9 cmt. The weight of more recent judicial opinions has embraced this standard. *See, e.g., Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 836 F.2d 1332, 1339 (Fed.Cir.1988) ("Only in unusual situations will the appearance of impropriety alone be sufficient to warrant disqualification."); *State v. Dimaplas,* 267 Kan. 65, 978 P.2d 891, 893 (1999) (finding "appearance of impropriety" approach to be no longer viable); *Bergeron v. Mackler,* 225 Conn. 391, 623 A.2d 489, 494 (1993) (rejecting appearance standard); *Jones v. Jones,* 258 Ga. 353, 369 S.E.2d 478, 479 (1988) (disapproving of disqualification based upon "appearance of impropriety based not on conduct but on status alone"); *see also Margulies by Margulies v. Upchurch,* 696 P.2d 1195, 1204 (Utah 1985) ("We recognize that disqualification motions based on very slight appearances of impropriety have been misused for tactical advantage in litigation."). In view of these precedents and the reliance of the *Trone* decision upon a Model Code-based approach specifically rejected by the new ABA Model Rules, this Court believes that Nevada would similarly shun an appearance of impropriety standard under the circumstances presented in this case.

Nor is this Court convinced that requiring proof of the actual transference of confidential information would unavoidably endanger the client-attorney privilege in this case. While it might make sense to apply a per se standard of disqualification in situations where the challenged attorney was directly involved in the first representation, the wisdom of such an approach becomes far less clear in cases where the attorney lacks any substantial involvement in the disputed matter. Thus, some jurisdictions limit automatic disqualifications to cases where the attorney whose disqualification is sought was *personally* involved in the representation of the former client. *See, e.g., Dieter v. Regents of the Univ. of California,* 963 F.Supp. 908, 910–12 (E.D.Cal.1997) (applying California law); *Chrispens v. Coastal Ref. & Mktg., Inc.,* 257 Kan. 745, 897 P.2d 104, 115 (1995) (describing Kansas law). "This allows attorneys on the periphery of issues to avoid being cast as having represented a client when, in fact, they merely belonged to the firm." *Id.* at 115; *see also Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir.1975) (noting that lawyers "who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions" cannot be characterizing as having "represented" the client). A rebuttable presumption standard, rather than a per se principle of disqualification, would avoid an "overly harsh" rule that would unduly prejudice the efforts of clients to acquire proper representation. *In re Del-Val Fin. Corp. Sec. Litig.,* 158 F.R.D. 270, 274 (S.D.N.Y.1994) (internal quotations and citation omitted); *see generally* Kenneth L. Penegar, *The Loss of Innocence: A Brief History of Law Firm Disqualification in the Courts,* 8 Geo. J. Legal Ethics 831 (1995) (surveying shift in case law from strict disqualification approach to more pragmatic analysis of confidence sharing).

This approach is entirely consonant with the new "functional analysis" methodology proposed by the commentary accompanying the latest version of ABA Model Rule 1.9:

Preserving confidentiality is a question of access to information. Access to information, in turn, is essentially a question of fact in particular circumstances, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together.

ABA Model Rule 1.9 cmt. This analysis grants substantially more leeway to attorneys than the one proposed by Defendant.

> [Model Rule 1.9] operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information.... Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict.

ABA Model Rule 1.9 cmt. Application of a per se rule of disqualification is thus now a disfavored practice and should be replaced by a functional analysis that applies a rebuttable presumption of attorney knowledge. *See SLC Ltd. V v. Bradford Group West, Inc.*, 999 F.2d 464, 468 (10th Cir.1993) (examining Utah Rules of Professional Conduct). The ABA Model Rules further support the functional analysis approach on the grounds that "it should be recognized that today many lawyers practice in firms, that many lawyers to some degree limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel." ABA Model Rule 1.9 cmt.

In view of the persuasive power ABA commentary wields upon the application of the Nevada Rules of Professional Conduct, *see* Nev.Sup.Ct.R. 150(2), this Court concludes that Nevada would also apply the rebuttable presumption standard to attorneys like Friedberg. Under this approach, Friedberg would bear the burden of rebutting the presumption that he actually acquired confidential information during his tenure at Rawlings Olson. *See e.g., In re American Home Prods. Corp.*, 985 S.W.2d 68, 78 (Tex.1998); *Norman v. Norman*, 333 Ark. 644, 970 S.W.2d 270, 274 (1998); *Parker v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580,

781 P.2d 1099, 1106 (1989). After reviewing the submitted evidence, this Court finds that Friedberg has satisfied his burden of rebuttal.

It is true that courts have disagreed as to whether the mere assertion by the challenged attorney that he was not privy to any confidential information is sufficient to rebut a presumption of shared confidences. *Compare Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 576 (S.D.N.Y. 1987) (rejecting uncorroborated affidavit of challenged attorney) *and Elan*, 809 F.Supp. at 1392 (declining to rely upon "unavoidably self-serving declarations" from law firm's current members) *with Dieter*, 963 F.Supp. at 912 (accepting affidavits of challenged attorneys where former employment took place in separate offices of large law firm) *and Senese v. Chicago Area I.B. of T. Pension Fund*, No. C97 C382, 1997 WL 766867, at *3 (N.D.Ill.1997) (accepting attorney affidavit challenged only by hearsay evidence). The best approach seems to be that advised by the ABA Model Rules: a fact-specific inquiry considering all relevant aspects of the case. *See* ABA Model Rule 1.9 cmt. (describing examination of access to information as "essentially a question of fact in particular circumstances").

Here, Friedberg has presented his own affidavit in which he categorically denies discussing, reviewing, or possessing any access to confidential materials in the disputed matter during his association with Rawlings Olson. (Friedberg Aff. ¶¶ 9–16.) This affidavit is corroborated by the affidavits of two persons, a Rawlings Olson partner and a paralegal, who had been directly involved in the prior representation of Defendant. (Desruisseaux Aff. ¶¶ 4–6, attached as Ex. 1 of Ex Parte Mot. (# 43); Wright Decl. (# 45) ¶¶ 5–8). While the lead attorney in Rawlings Olson acknowledges that it was "possible" that he may have discussed certain matters with Friedberg, he concedes that he could not recall any specific instances in which he had actually done so. (Nitz Aff. ¶ 8, attached as Ex. 1 of Def.'s Mot. to Disqualify (# 22)). The lack of any direct, focused evidence of confidence-sharing is a relevant factor in the consideration of attorney disqualification.

*See Deemer Steel Casting Co. v. East Coast Erectors, Inc.,* No. CIV. A. 10593, 1990 WL 143840, at *5 (Del.Ch. Sept. 28, 1990). Accordingly, this Court finds that even under the application of an imputed disqualification analysis, Friedberg would successfully rebut a presumption of shared information.

IT IS THEREFORE ORDERED that the Motion to Disqualify (# 22), filed by Defendant 360° Communications, dba the Alltel Corporation, is DENIED.