EXTERIOR SYSTEMS, INC. d/b/a Fabwel, Inc., Plaintiff,

v.

NOBLE COMPOSITES, INC., Larry Farver, Kenneth Farver, and Edward Welter, Defendants.

No. 3:01–CV–217 RM.

United States District Court, N.D. Indiana, South Bend Division.

June 24, 2002.

Paul J Peralta, D Lucetta Pope, Eric J Groen, Alison G Fox, Andrea G Hoffman, Baker and Daniels, South Bend, IN, for Exterior Systems Inc, a Wholly–Owned Subsidiary of Fibreboard, Inc, a Wholly–Owned Subsidiary of Owens Corning dba Fabwell Inc, plaintiff.

·John D Ulmer, Yoder Ainlay Ulmer and Buckingham, Goshen, IN, for Noble Composites Inc, Larry E Farver, Kenneth Farver, defendants.

Gary D Boyn, Cynthia S Gillard, Michelle C Hilary, Warrick and Boyn, Elkhart, IN, Edward L Murphy, Jr, Stephen J Harants, Miller Carson Boxberger and Murphy, Fort Wayne, IN, for Edward Welter, defendant.

## MEMORANDUM AND ORDER

NUECHTERLEIN, United States Magistrate Judge.

On March 28, 2002, five months after his previous counsel was disqualified for vio-

lating conflict of interest rules, Defendant Edward Welter's new counsel filed a Motion to Disqualify the opponent's counsel [Doc. No. 179]. The instant motion lacks merit and is **DENIED**.[1]

## I. FACTUAL BACKGROUND

On December 4, 2001, this Court disqualified Welter's previous counsel, Cynthia Gillard and her firm Warrick & Boyn. *Exterior Systems, Inc. v. Noble Composites, Inc.*, 175 F.Supp.2d 1112 (N.D.Ind. 2001). The Court assumes the reader's familiarity with the specific facts of that opinion and only restates the facts generally in this opinion.

Defendant Welter formed Fabwel, Inc. ("Fabwel") in 1972, and he owned and controlled Fabwel, for the most part, until 1997. During that time, the lawyers of Warrick, Weaver & Boyn (or later Warrick & Boyn) served as counsel to Welter and to Fabwel. In 1997, Welter sold Fabwel, and its successor is Plaintiff Exterior Systems, Inc. ("ESI"). ESI is now suing Welter and others for breach of covenants not to compete and related claims. ESI claims that Welter is investing in or assisting a contractually-prohibited, competing business (Noble Composites, Inc.) through his company E.W. Marine. Welter counterclaimed, alleging, among other things, that ESI failed to make payments to Welter under the provisions of a 1990 Executive Benefit Plan and its 1997 amendment.

Welter seeks to disqualify the law firm of Baker & Daniels from representing ESI because current Baker & Daniels attorneys Kennard Weaver and Angela Castille, and paralegal Beckie Mills, during their prior association with the law firm of Warrick, Weaver & Boyn ("WW & B") had

---

1. On June 10, 2002, Welter filed a Supplemental Motion to Disqualify the Baker & Daniels Law Firm [Doc. No. 217], which raises new grounds for disqualification unrelated to the present motion. The Supplemental Motion is not ripe for decision, and this opinion does not address any of the issues raised in the Supplemental Motion.

represented Welter and other entities. Welter also bases his motion to disqualify on representations by other WW & B attorneys before October 1993, when Weaver, Castille, and Mills left that firm to join Baker & Daniels. Last, Welter argues for disqualification based on Weaver's recent representations of Pleasant Street Homes, LLC. ESI responds by claiming that no conflict exists and by arguing that Welter waited too long to file his motion to disqualify and thus has waived any objection to ESI's choice of counsel.

## A. Representations of Welter by Attorneys Weaver and Castille and Paralegal Mills

This section will analyze and reconstruct the representation of Welter by attorneys Weaver and Castille and paralegal Mills directly. Representation of Welter performed by others in the same firm as Weaver, Castille, and Mills will be analyzed in Section I.B below. Weaver's recent representation of Pleasant Street Homes, LLC will be discussed in Section I.C below. The facts relating to the waiver issue will be discussed in Section I.D below.

### 1. Weaver's Representation of Welter

As a partner in WW & B, Weaver provided extensive legal services to Welter and the company formerly known as Fabwel, Inc. until September 1985. Weaver performed some of the work to form Fabwel in 1972, and provided legal advice to Fabwel after its formation. In particular, Weaver helped Fabwel acquire other companies. Those transactions often involved the drafting of covenants not to compete on behalf of Fabwel. Weaver also provided legal counsel to Welter and his family on numerous business and personal matters unrelated to Fabwel, including Welter's estate planning.

In September 1985, Weaver's representation of Welter, Fabwel, and all other Welter-related companies ended at Welter's request. Welter had Gillard represent him and Fabwel from 1985 on. Gillard removed all of Welter's and Fabwel's files from Weaver's office and kept them in her own office. Gillard was Welter's sole contact at the firm. Weaver received no correspondence or copies of correspondence from Welter or his companies after 1985. Weaver had no further contact with Welter except for a few rare and brief social encounters.

Weaver never represented E.W. Marine because Welter did not form it until 1988. Weaver was involved in the planning of various assets that were later obtained by E.W. Marine when that company came into existence. At least one of those assets, a Waco, Texas, plant is currently owned by E.W. Marine and leased to ESI. Weaver represented Welter in obtaining revenue bond financing for the Waco facility in 1983. Weaver also helped Welter form a partnership called Jewel Real Estate in 1975 and D & E Industries, Inc. These entities were precursors to E.W. Marine, Inc.

Weaver left WW & B in 1993 to join the Elkhart office of Baker & Daniels. Castille and Mills followed him to Baker & Daniels soon after. Warrick, Weaver & Boyn changed its name to Warrick & Boyn. This opinion will continue to use "WW & B" to signify the firm before Weaver left in 1993, but it will use "W & B" to denote the firm after Weaver left.

Weaver has not been involved with this case in any capacity. He has not discussed his past representation of Fabwel, Welter, or any of Welter's business interests with other Baker & Daniels lawyers working on the case, except (1) when a new business memorandum was published within the firm, he discussed with Paul Peralta and other partners whether a conflict existed; (2) he described the nature

and extent of his prior representation for the purpose of preparing his affidavit in response to the motion to disqualify, and (3) he was told that the motion to disqualify Gillard had been filed, and the grounds for filing the motion.

### 2. Castille's Representation of Welter

Castille graduated from law school in 1988 and joined WW & B as an associate in March 1989. At that time Cynthia Gillard served as counsel for Welter and also served as counsel for the company formerly known as Fabwel, Inc. In 1990, at the beginning of her second year as an associate, Castille assisted Gillard with legal research and related tasks on behalf of Fabwel. To the best of her knowledge, Castille did not draft the 1990 Amendment to the Executive Benefit Plan and did not communicate with Welter regarding it. At most, Castille researched some legal issues relating to the 1990 Amendment under Gillard's direction.

In 1992, Castille assisted Gillard in connection with the repurchase of Fabwel stock from ABF Investors, Inc. by a company in which Welter owned a majority interest. She did not advise Welter on his rights and duties under the 1988 non-compete agreement with ABF or any other agreements not to compete. Nor did she advise Welter in 1992 regarding the 1990 Executive Benefit Plan. Castille primarily drafted documents and took no part in the negotiations surrounding the repurchase of Fabwel. Castille also provided legal advice to E.W. Marine in connection with a commercial lease unrelated to the facts of this case.

In October 1993, Castille left WW & B, along with Weaver and Mills, to join the Elkhart office of Baker & Daniels. She has not been involved with this case in any capacity. She has not discussed her past representation of Fabwel and Welter with other Baker & Daniels lawyers working on the case, except (1) she described the nature and extent of her prior representation for the purpose of preparing her affidavit in response to the motion to disqualify, and (2) she discussed the nature and extent of her past representation to the attorneys who prepared the original motion to disqualify Gillard.

### 3. Mills's Representation of Welter

Beckie Mills is not an attorney. She worked as a paralegal at WW & B until 1993 when she left to join Weaver and Castille at the Baker & Daniels Elkhart office. Mills provided various paralegal services to E.W. Marine, but claims not to have received any confidential information relevant to this case. Mills has not worked on the present matter and has not discussed her previous employment at WW & B with the Baker & Daniels lawyers litigating this case, except for the purposes of preparing her affidavit attached to the motion to disqualify.

### B. Representation of Welter by Other Attorneys at Warrick, Weaver & Boyn

Weaver stopped working for Welter and his companies in 1985, but other attorneys at WW & B represented Welter while Weaver was still a partner of the firm. WW & B, specifically Cynthia Gillard, advised Welter in 1987 when he sold his stock in Fabwel to ABF Investors, Inc. Gillard advised Welter as to his rights and obligations under a Non–Compete Agreement with ABF. In 1988, WW & B (Gillard) advised Fabwel during the acquisition of the stock of Master–Fab Inc. from Defendant Larry Farver. WW & B (Gillard) drafted the Non–Compete Agreement signed by Defendant Larry Farver as part of the closing. This Non–Compete Agreement is part of the basis of ESI's claims against Larry Farver in this case.

Also in 1988, WW & B (Gillard) incorporated E.W. Leasing, which is now known as E.W. Marine. Mills provided unrelated paralegal services to E.W. Marine sometime after 1988. W & B (through Gillard) continues to provide legal services to E.W. Marine.

WW & B also drafted the 1990 Executive Benefit Plan. Specifically, Gillard drafted the plan, although Angela Castille researched some legal issues relating to the 1990 Amendment under Gillard's direction. In 1992, WW & B assisted Welter with the repurchase of Fabwel's stock from ABF. Castille assisted Gillard with the transaction.

### C. Weaver's Current Representation of Pleasant Street Homes, LLC

A group of investors, including John Guequierre, Bill Reasor and Jim Jones, started Pleasant Street Homes LLC ("Pleasant Street") in December 2000. They hired Weaver and Baker & Daniels to provide legal advice at Pleasant Street's creation. Welter joined the investor group as an outside investor of Pleasant Street. Welter has never been a sole manager, a majority owner, or an officer of the company. Weaver's only contact with Welter was at monthly managers meetings, where the discussions were with the management team of Pleasant Street as a group. Weaver never provided individual legal advice to Welter regarding his investment in Pleasant Street. Weaver and Baker & Daniels represented Pleasant Street until August 2001, and Weaver no longer has any files relating to Pleasant Street.

### D. The Timing of Welter's Motion to Disqualify

On March 1, 2001, ESI's counsel, Baker & Daniels, sent a letter to Welter demanding that he end all business relations with Noble Composites. Welter's counsel responded on March 13, 2001, asserting, in part, that Baker & Daniels had a conflict of interest because it represented Pleasant Street. ESI filed its complaint on March 15, 2001. On March 16, Welter's counsel sent a letter to Baker & Daniels arguing that Baker & Daniels had a conflict of interest because of the former representation of Weaver, Castille, another lawyer, and two paralegals.

On June 25, 2001, Defendant Welter filed his Answer with Counterclaim. ESI filed an answer to the counterclaim on July 31, 2001. On August 21, 2001, ESI filed its Motion to Disqualify Counsel, which was granted on December 4, 2001. Welter's new counsel entered their appearance on February 20, 2002, and filed the present motion to disqualify on March 28, 2002. A preliminary injunction hearing is scheduled for June 25, 2002.

## II. LEGAL ANALYSIS

Two critical considerations, the sacrosanct privacy of the attorney-client relationship and the prerogative of a party to proceed with counsel of its choice, require a court to proceed with careful and thoughtful analysis when deciding motions to disqualify counsel. *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983).

The Seventh Circuit warns that disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Board of Educ.*, 17 F.3d 1059, 1066 (7th Cir.1994) (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)). Disqualification motions "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman*, 689 F.2d at 722. Yet, the Seventh Circuit has instructed courts to resolve doubts in favor of disqualification. *United States v. Goot*, 894 F.2d 231, 235 (7th Cir.1990).

The Local Rules of the United States District Court for the Northern District of

Indiana adopt Indiana's version of the Model Rules of Professional Conduct. N.D. Ind. L.R. 83.5(f). Indiana Rule of Professional Conduct 1.9 states as follows:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known.

Applying the "substantial relationship test" in Rule 1.9 is a three-step process:

First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252, 255–56 (7th Cir.1983). If this analysis shows that a substantial relationship did exist, then the court is entitled to presume that the attorney received confidential information during his or her prior representation. *Id.*

Rule 1.9 applies when an individual lawyer has represented a client in a prior matter and where the issue is whether *that lawyer* may oppose the former client in a substantially related matter. Rule 1.10 addresses situations where a conflict of interest may be imputed to *other lawyers* associated in the same firm with the tainted lawyer. The pertinent portion of Rule 1.10 states as follows:

(a) While lawyers are associated in a firm, none of them shall represent a client if he knows or should know in the exercise of reasonable care and diligence that any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.8(k), 1.9, or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not represent a person in the same or a substantially related matter if it knows or reasonably should know that that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

■ The Seventh Circuit analyzes whether the remedy of disqualification is warranted under a series of presumptions. As stated earlier, if the substantial relationship test is satisfied, the court is entitled to presume that the attorney received and shared confidences of the former client. This presumption is irrebuttable in situations where an entire firm switched sides, but is rebuttable in situations where particular lawyers change jobs to firms representing an adversary. *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1267 (7th Cir.1983); *Chapman v. Chrysler Corp.,* 54 F.Supp.2d 864, 866 (S.D.Ind. 1999).

This case involves particular lawyers who have switched firms; thus, the presumption of shared confidences may be rebutted under the following three-step analysis:

First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a

substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make the disqualification proper.

*Cromley,* 17 F.3d at 1064 (quoting *Schiessle,* 717 F.2d at 420).

The first *Cromley* test is the substantial relationship test in Rule 1.9(a). The second *Cromley* test is a restatement of Rule 1.10, which finds no conflict of interest where the lawyer switching firms did not actually learn client confidences. The last of the three *Cromley* tests—whether the presumption of shared confidences has been rebutted with respect to the present representation—involves the question of screening, sometimes referred to as an insulation wall, or in the past as a "Chinese wall." *Cromley,* 17 F.3d at 1065 (citing *Schiessle,* 717 F.2d at 421).

■ A party can also waive the right to seek disqualification by waiting too long to file its motion to disqualify. *E.g., Cox v. American Cast Iron Pipe Co.,* 847 F.2d 725, 731 (11th Cir.1988); *Trust Corp. MT v. Piper Aircraft Corp.,* 701 F.2d 85, 87 (9th Cir.1983); *Central Milk Producers Co-op. v. Sentry Food Stores,* 573 F.2d 988, 992 (8th Cir.1978); *Redd v. Shell Oil Co.,* 518 F.2d 311, 315 (10th Cir.1975). In this situation, a violation of the Rules of Professional Conduct occurs, but disqualification is not warranted.

With these legal principals in mind, the Court will analyze the alleged conflicts of Weaver, Castille, and Mills separately.

### A. Weaver

#### 1. Weaver's Representation of Welter and Fabwel from 1972 to 1985

Weaver served as Welter's and Fabwel's main counsel as a partner in WW & B from 1972 to 1985. During that representation, Weaver performed extensive legal work ranging from the formation of Fabwel to estate planning for Welter personally. The relationship ended, however, at Welter's request in 1985. Weaver left WW & B in 1993 to join Baker & Daniels.

The legal work performed by Weaver on behalf of Welter and Fabwel from 1972 to 1985 is not substantially related to the present case. The only legal work that could arguably be substantially related is Weaver's representation of Fabwel as Fabwel acquired several smaller companies. As part of the closings in those acquisitions, Weaver drafted non-compete contracts protecting Fabwel that were signed by the principals of the acquired companies. None of those contracts are in dispute in the present case, but Welter claims that Weaver provided "advice on non-compete agreements" to Fabwel, which at the time was solely owned and controlled by Welter. Thus, Weaver would have "inside information and knowledge regarding Welter's thought processes concerning non-compete agreements." Welter's Mem. of Law in Supp. of Mot. to Disqualify at 12.

■ The comment to Rule 1.9 states that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." The non-compete contracts at issue in this case are wholly distinct from those Weaver drafted on behalf of Fabwel. Thus, although they are the same type of problem, Weaver's work on

Fabwel's non-compete contracts before 1985 is not substantially related to his current firm's prosecution of this case.[2]

Welter also claims that Weaver's work for the precursors to E.W. Marine or his work planning real estate assets that were later obtained by E.W. Marine is substantially related to the issues in this case. The Court sees no connection. When Weaver represented Welter and the precursor companies, E.W. Marine did not exist. E.W. Marine is not alleged to be the successor to the precursor companies; it obtained only some of the precursors' assets. Weaver was not involved in the decision to form E.W. Marine or in the decision to include certain assets among its holdings.

**2. Representation by WW & B Lawyers Other Than Weaver from 1985 to 1993**

Next, Welter points to the work performed on behalf of Welter by Weaver's partners at WW & B from 1985 (when Weaver stopped working for Welter) until 1993 (when Weaver left WW & B to join Baker & Daniels). Welter argues that the work of Weaver's partners should be imputed to Weaver, and then Weaver carried this taint with him to Baker & Daniels where it should be imputed to other Baker & Daniels lawyers.

■ The Rules of Professional Conduct do not support Welter's argument. The comment to Indiana's Rule 1.10 rejects the notion that "a partner in a law firm is conclusively presumed to have access to all confidences concerning all clients of the firm." Rather, Indiana's Rules of Professional Conduct embrace a functional approach. "A rule based on a functional analysis is more appropriate for determining the question of vicarious disqualification." *Id.* As part of this functional approach, Rule 1.10(a) imputes all conflicts of interest to all lawyers in the firm while they are associated with the firm.[3] After a lawyer leaves his firm to join a new firm, however, Rule 1.10(b) governs. Rule 1.10(b) requires law firms to reject representation only where a new lawyer to the firm had represented an adverse client while at his former firm *and had acquired actual client confidences.* Simply working at a firm at the same time as the past representation is not enough for imputation of a conflict of interest to the lawyer's new firm.

*Cromley* explained how this rule functions in the Seventh Circuit's shifting presumption approach:

> We must determine whether the attorney whose change of employment created the disqualification issue *was actually privy to any confidential information* his prior law firm received from the party now seeking disqualification of his present firm. The rebuttal can be established . . . by proof that the attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior repre-

---

**2.** In this Court's previous opinion, the Court recognized that a lawyer's work on the same type of problem for a past client may *bolster* the Court's decision to disqualify an attorney currently acting adverse to the former client. *Exterior Systems, Inc.,* 175 F.Supp.2d at 1117–18. That opinion made clear, though, that the sufficient and independent reason for disqualification was because Attorney Gillard was essentially attacking her own work in the form of the Executive Benefit Plan. *Id.* at 1117. Gillard's work on the same generic type of problem—in that opinion non-competition contracts on behalf of Fabwel—was not sufficient standing alone to support disqualification, but it did bolster the Court's decision to disqualify on other grounds. *Id.*

**3.** Rule 1.10(a) was the basis for disqualifying Cynthia Gillard's firm, Warrick & Boyn, in the Court's previous decision.

*sentation .... Uncontroverted affidavits are sufficient rebuttal evidence.*

*Cromley,* 17 F.3d at 1064–65 (citations and internal quotations omitted; emphasis added). *Accord: Edwards v. 360° Communications,* 189 F.R.D. 433, 436 (D.Nev. 1999) (applying a version of Rule 1.9 and Rule 1.10 under Nevada law that is nearly identical to Indiana's version); *(Dieter v. Regents of the University of California,* 963 F.Supp. 908, 911–12 (N.D.Cal.1997) applying the Model Rules of Professional Conduct and the Restatement (Third) of the Law Governing Lawyers as being consistent with California law). Thus, no violation of Rule 1.10(b) occurs unless the lawyer who switched firms actually gained confidential information from the former client while working for his former firm.

 Under this standard, Weaver's imputed conflict does not transfer to his new firm because Weaver was not privy to Welter's confidential information on any matter related to the present dispute. It is true that at least some of the work performed by Weaver's partners (in most cases Gillard) from 1985 to 1993 is substantially related to the present case. Thus, while Weaver still worked at WW & B, any conflict would be imputed to him and he could not take a position adverse to his partners' substantially related work. Rule 1.10(a).

Weaver's disability ended, though, when he left WW & B in 1993 because he was not privy to Welter's confidences after 1985 (and none of the pre–1985 confidences relate to the present dispute). Weaver has submitted an uncontroverted affidavit stating that his representation of Welter, Fabwel, and Welter-related companies ended at Welter's request in 1985. Weaver Affidavit ¶ 4. Welter informed Weaver that Cynthia Gillard would be his lawyer and that Welter would communicate directly with Gillard. *Id.* Gillard removed all of Welter's and Fabwel's files from

Weaver's office in 1985 and kept them in her own office. *Id.* ¶ 5. Gillard became Welter's sole contact at the firm, and Weaver received no correspondence or copies of them from Welter or Welter-related companies after 1985. *Id.* Weaver had no further contact with Welter except for a few rare and brief social encounters. *Id.* Nothing in the record indicates that Weaver assisted Gillard with her representation of Welter. Weaver has successfully rebutted the presumption of shared confidences.

After 1985, Weaver did not receive Welter's confidences. Accordingly, Weaver carried no taint with him to his new firm, Baker & Daniels. His partners' legal work for Welter from 1985 to 1993 does not provide a basis for disqualifying Baker & Daniels in this case.

**3. The Duty of Loyalty Does Not Apply to Imputed Lawyers in Other Firms**

Welter argues that an attorney's duty of loyalty requires disqualification in this case. He points to this Court's previous decision disqualifying his former counsel, Gillard. Welter's argument is misplaced because it misinterprets this Court's previous decision and because this motion presents a different factual situation.

First, Welter incorrectly charges this Court with recognizing a "general duty of loyalty to clients." Welter's Reply in Supp. of Mot. to Disqualify at 1 (incompletely quoting this Court's earlier decision, *Exterior Systems,* 175 F.Supp.2d at 1119). This Court's earlier decision noted that *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168 (5th Cir.1979), had recognized that "[t]he purpose of the substantial relationship test extended beyond protection of client confidences to a *more* general duty of loyalty to clients." *Exterior Systems,* 175 F.Supp.2d at 1119 (emphasis added). In other words, the

duty of loyalty is broader, or more general than, the protection of client confidences under the facts of *Brennan's* and the facts of Gillard's representation of Welter. This Court never held that the duty of loyalty is simply and non-relatively "general," in the sense that it extends to all adverse positions taken by a lawyer against a former client.[4]

Second, this Court's previous decision to disqualify Gillard involved a situation where a single lawyer, Gillard, was attacking her own work. The present motion, by contrast, involves disqualification by imputation to other lawyers in other firms. As mentioned earlier, the comments to Indiana's Rules of Professional Conduct take a functional approach. The comments identify two functions served by the conflict of interest rules: preserving confidentiality and avoiding positions adverse to a client—what this opinion has called "client loyalty." The comment to Rule 1.10 addresses the second of these two functions:

> The second aspect of loyalty to client is the lawyer's obligation to decline subsequent representations involving positions adverse to a former client arising in substantially related matters. *This obligation requires abstention from adverse representation by the individual lawyer involved, but does not properly entail abstention of other lawyers through imputed disqualification.* Hence, this aspect of the problem is governed by Rule 1.9(a). Thus, if a lawyer left one firm for another, the new affiliation would not preclude the firms involved from continuing to represent clients with adverse interests in the same or related matters, *so long as the*

> *conditions of Rule 1.10(b) ... concerning confidentiality have been met.*

(Emphasis added.) Under the Rules of Professional Conduct, then, client loyalty (*i.e.*, the duty not to take a position adverse to a former client) is broader in situations where the same lawyer is representing an adverse client in a substantially related matter. In those situations—and Gillard's representation in this Court's previous decision was one of them—the duty of loyalty is equal to the duty of confidentiality under the dictates of Rule 1.9(a). The present situation, by contrast, involves a claim of conflict by imputation. Situations involving imputation to lawyers in another firm are governed by Rule 1.10(b), which limits the duty of loyalty solely to the duty to maintain client confidences.

█ The present disqualification motion offers a good example of why Rule 1.10(b) concerns itself only with client confidences. Welter is asking for loyalty from Weaver beyond the duty of nondisclosure even though Welter terminated the relationship with Weaver. Welter was loyal to Weaver until 1985, then he shifted his loyalty to Gillard. All of the substantially related work was performed by Gillard and other WW & B lawyers, not Weaver, after 1985. Certainly, Weaver has a continuing duty not to use the client confidences he actually learned before 1985 against his former client. However, once Welter shifted his loyalty (and his work) to a different lawyer, and Weaver left to join a different firm, Weaver has no continuing duty of loyalty in matters related to work he did not perform. Welter asks for even more than this, however. Welter asks that the

---

4. Specifically, the Court stated that "[Rule 1.9(a)'s] loyalty requirement extends beyond situations where client confidences are actually learned and used, but the duty of loyalty does not extend to the point of never allowing an attorney to take a position adverse to a

former client. [It] extends the duty of loyalty to situations where it reasonably can be inferred that the attorney learned related confidences during the prior representation on a 'substantially related matter.'" *Exterior Systems,* 175 F.Supp.2d at 1115.

duty of loyalty extend beyond Weaver to other lawyers at Baker & Daniels, trial counsel in this case, who have never represented Welter. This request takes the duty of loyalty to the extreme and would produce a result that would effectively prevent all partners and most associates from ever switching firms for fear of conflicts. The duty of loyalty, *i.e.*, the duty not to take a position adverse to a former client, does not extend beyond the duty to preserve client confidences in cases of multiple-firm imputation under Rule 1.10(b).

### 4. Weaver's Representation of Pleasant Street

From December 2000 to August 2001, Weaver represented the incorporators of Pleasant Street and then the corporation after its formation. Welter was never more than a non-operating investor in Pleasant Street, so Weaver did not represent Welter individually. Even if Welter were considered one of the incorporators, Weaver's representation of him was in the past. Welter has made no showing of a substantial relationship under Rule 1.9. Weaver's representation of Pleasant Street does not serve as a basis for disqualifying Baker & Daniels in this matter.

### B. Castille

Welter next argues that Baker & Daniels should be disqualified based on the work of Angela Castille while she was an associate at WW & B. Castille joined WW & B a few months after law school and worked there from 1989 to 1993. In 1993, she left WW & B to join the Elkhart office of Baker & Daniels, where she is still employed. Welter identifies two areas of conflict: Castille's work on the Executive Benefit Plan in 1990 and Castille's work on

Welter's repurchase of Fabwel stock from ABF Investors in 1992.

### 1. Castille's Work on the 1990 Executive Benefit Plan

Billing records[5] from 1990 show that Castille worked for 5.2 hours researching whether the Executive Benefit Plan was subject to the provisions of the Employee Retirement Income Security Act ("ERISA"). That time also includes reporting her findings to Cynthia Gillard and others at WW & B. As explained in this Court's previous decision, the 1990 Executive Benefit Plan is centrally relevant to the present dispute. Welter's counterclaim alleges a breach of the 1990 agreement and its 1997 amendment.

ESI defends its position by pointing out the limited nature of Castille's representation and asserting that Castille did not acquire any confidences from Welter. ESI also argues that Fabwel (and not Welter) was the client.

Castille was just beginning her second year as a lawyer when she researched a matter related to the 1990 Executive Benefit Plan. Her research amounted to 5.2 hours of time and related to whether the plan was governed by ERISA, an issue not raised to this point in this case. Her affidavit states that "[t]o the best of my knowledge, I did not communicate with Welter or anyone else regarding Welter's intent or interpretation regarding the proposed Amendment in 1990." The billing records show no communication with Welter.

As mentioned previously, the analysis under the substantial relationship test includes the question of "whether it is reasonable to infer that the confidential infor-

---

**5.** The billing records attached to Welter's reply have not been authenticated, but ESI does not challenge their authenticity. Consequent- ly, the Court will assume that the billing records are what Welter claims they are.

mation allegedly given would have been given to a lawyer representing a client in those matters." *LaSalle Nat'l Bank,* 703 F.2d at 255–56. If a substantial relationship is established, then Court presumes that confidences were shared. *Id.* at 256. The presumption may be rebutted, however, with evidence that the attorney was not privy to the confidences and secrets of the client. *Id.* at 257. When analyzing both the second prong of the substantial relationship test and the rebuttal of the presumption, the Court may consider several factors including "the size of the law firm, the area of specialization of the attorney, [and] the attorney's position in the firm." *Freeman,* 689 F.2d at 723. *Accord: LaSalle Nat'l Bank,* 703 F.2d at 257 and *Schiessle,* 717 F.2d at 420–21. Another factor is the "duration of time spent by an attorney on a particular matter." *Novo Terapeutisk Laboratorium v. Baxter Travenol Labs.,* 607 F.2d 186, 189 (7th Cir. 1979) (panel decision), *rev'd on other grounds, Novo Terapeutisk,* 607 F.2d at 194–97 (en banc decision).

ESI cites *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751 (2d Cir.1975), for a similar proposition. *Silver Chrysler* recognized that "ethical problems cannot be resolved in a vacuum.... Thorough consideration of the facts ... is required. Nor can judges exclude from their minds realities of which fair decision would call for judicial notice." *Id.* at 753 (citations and internal quotes omitted). One of those realities concerned inexperienced associates:

It is unquestionably true that in the course of their work at large law firms, associates are entrusted with the confidences of some of their clients. But it would be absurd to conclude that immediately upon their entry on duty they become the recipients of knowledge as to the names of all the firm's clients, the contents of all files relating to such clients, and all confidential disclosures by client officers or employees to any lawyer in the firm. Obviously such legal osmosis does not occur.

*Id.* at 753–54. The court applied this reality to a disqualification motion alleging that a lawyer had previously represented Chrysler on several matters while a new associate at the firm of Chrysler's current counsel.

But there is reason to differentiate for disqualification purposes between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions. In large firms at least, the former are normally the more seasoned lawyers and the latter the more junior. This is not to say that young attorneys in large firms never become important figures in certain matters but merely to recognize that some of their work is often of a far more limited variety. Under the latter circumstances the attorney's role cannot be considered "representation" ... so as to require disqualification.

*Id.* at 756–57 (citations omitted).[6]

Judge Adams's concurring opinion explained that the disqualification analysis

---

**6.** *Silver Chrysler* 's peripheral representation doctrine was cited with approval but distinguished in the panel opinion of *Novo Terapeutisk,* 607 F.2d at 189, 191 (panel decision). *Novo Terapeutisk* was reheard en banc, and the en banc court reversed the panel decision, relying in part on *Silver Chrysler. Novo Terapeutisk,* 607 F.2d at 197 (en banc decision).

In addition, *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223 n. 1, 227 (7th Cir.1978), and *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 712–13 (7th Cir.1976), cited the principles of *Silver Chrysler* with approval, but distinguished them under the particular facts of those cases.

... should focus on the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases. As part of its review, the court should examine the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy. *Id.* at 760. The court concluded on the facts of that case that the lawyer's prior involvement with specific Chrysler legal matters was "at most, limited to brief, informal discussions on a procedural matter or research on a specific point of law." *Id.* at 756. On this basis, the court affirmed the district court's decision refusing to disqualify the lawyer. *Id.* at 758.

■ The particular facts of this case show that Castille was no more than peripherally involved in the drafting of the 1990 Executive Benefit Plan. Castille was an inexperienced lawyer in 1990, and she spent a mere 5.2 hours researching a discrete legal issue under ERISA, which has never been a part of this case. Furthermore, she never spoke to the client Welter. It is highly unlikely that she received client confidences related to the present case because her representation of Welter was peripheral. In her uncontroverted affidavit, she denies receiving confidential information. This is sufficient to rebut the presumption of acquired confidences.[7]

## 2. Castille's Work on the 1992 Repurchase of Fabwel from ABF Investors

Billing records from 1992 show that Castille worked over 150 hours on Welter's repurchase of Fabwel stock from ABF Investors. She drafted the stock purchase agreement, the necessary paperwork to the secretary of state, a bill of sale, shareholder resolutions, a release, a Subchapter S agreement, notices, intellectual property assignment documents, a termination of stock option agreement, and other closing documents. She had conferences with WW & B lawyers and one short telephone call with Welter.

Castille was more than peripherally involved with the 1992 transaction. It is reasonable to assume that she would have received at least some client confidences relating to the repurchase of Fabwel from ABF Investors. The next question, then, is whether her 1992 representation is related to the present litigation. Welter says that it is. Welter's affidavit is nonspecific though: "Castille's work included services provided in connection with ... the purchase of Fabwel stock from ABF." Welter Affidavit ¶ 11. The affidavit also states, "The repurchase of stock of Fabwel back from ABF ... included privileged discussions with counsel regarding Non–Compete Agreements with ABF and the Executive Benefit Plan." In his Reply, Welter makes another unsupported allegation: "Part of the repurchase of Fabwel involved the negotiation surrounding the Executive Benefit Plan and discussions among the investment group of Larry Farver's Non–Compete and Confidentiality Agreement he signed in 1988." Welter's Reply in Supp. of Mot. to Disqualify at 2. Castille's billing records do not indicate a substantial relationship on their face. In sum, Welter has produced copies of billing records that do not clearly indicate a substantial relationship, a nonspecific affidavit, and an unsupported statement in his brief.

---

7. ESI's argument that Fabwel was the client, and not Welter, is unconvincing. Welter was the largest beneficiary under the 1990 Executive Benefit Plan, and served as Fabwel's president and chief executive officer at the time the plan went into effect. Welter is best considered as a joint client with Fabwel for purposes of drafting the 1990 Executive Benefit Plan.

■ The Court finds no substantial relationship here. The repurchase occurred in 1992, nine years before the facts underlying this case and five years before Welter signed the 1997 non-compete agreement at issue in this case. Welter's non-compete agreement with ABF, which Welter signed in 1987, is not the subject of this suit. Welter's allegation that he discussed the Executive Benefit Plan with WW & B is too vague for the Court to link it with Castille. Castille denies advising Welter regarding the Executive Benefit Plan and denies conducting any of the negotiations on behalf of Welter. Welter's affidavit does not assert Castille's involvement with the discussions in 1992 relating to the Executive Benefit Plan. Neither affidavit discusses the substance of the single, short phone call between Welter and Castille. Welter's remaining contentions are not contained in his affidavit and are not properly before the Court. They are also vague and undeveloped. The 1992 repurchase of Fabwel does not provide a basis for disqualifying Baker & Daniels.

## C. Mills

■ Mills is not a lawyer; she is a paralegal. Strictly speaking, the conflict of interest rules do not apply to paralegals who are assisting the lawyers in a law firm. Instead, paralegals are governed indirectly by Rule 5.3, which imposes on the supervising lawyers the duty to ensure that their nonlawyer assistants' conduct is "compatible with the professional obligations of the lawyer."

Welter presents very little argument as to why Baker & Daniels should be disqualified through Mills. Welter claims that Mills provided unspecified services for E.W. Marine. He claims that one of the issues in this case involves the scope of services conducted by E.W. Marine before and after the 1997 non-compete agreement signed by Welter. Baker & Daniels allegedly would have inside knowledge about

the inner workings of E.W. Marine through Mills.

Welter has not described, even in general terms, the extent of Mills's work on behalf of E.W. Marine, nor has he rebutted Mills's affidavit that says she has

had no discussions about my past employment with [WW & B] or any tasks that I might have performed at [WW & B], with any Baker & Daniels attorney involved in [this case], except to the extent necessary to prepare Baker & Daniels' response to the Defendant's motion to disqualify Baker & Daniels and Baker & Daniels' motion to disqualify [W & B], and only as regards the timing and subject matter of those tasks.

Mills Affidavit ¶ 5. Welter has not cited a single case involving disqualification through a paralegal. The Court's own research has found no case disqualifying a firm based on facts similar to the present situation. Consequently, Welter's attempt to disqualify Baker & Daniels through Mills is undeveloped and unconvincing. Mills does not provide a basis for disqualifying Baker & Daniels.

## D. Waiver

■ Welter's motion to disqualify fails on its merits. It suffers an additional defect as well. Welter filed his motion more than twelve months from the time he and his counsel first learned of the potential conflict. Twelve months is too long to wait. Welter has waived his right to seek disqualification in this case.

■ As mentioned before, a former client's ability to seek disqualification of its adversary's attorney can be waived if the former client knew of its attorney's representation of an adversary, but failed to raise its objection promptly. *E.g., Trust Corp. MT v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983). When determining

whether a party has waived its objections, courts should consider the following: 1) the length of the delay in bringing the motion to disqualify; 2) when the former client learned of the conflict; 3) whether the former client was represented by counsel during the delay; 4) why the delay occurred; and 5) whether the delay would result in prejudice to the nonmoving party. *Chemical Waste Management, Inc. v. Sims,* 875 F.Supp. 501, 505 (N.D.Ill.1995).

In this case, Welter knew about the potential conflict of interest no later than March 16, 2001, when his counsel sent a letter to Baker & Daniels objecting to Baker & Daniels's conflict of interest through Weaver and Castille. Welter did not file his motion to disqualify, however, until March 28, 2002, more than twelve months later. He was represented at all times during this delay except for the two weeks it took for Welter to obtain new counsel after Judge Miller's approval of this Court's disqualification of Gillard. During those twelve months, Baker & Daniels performed thousands of hours of work litigating this case and preparing for a preliminary injunction hearing that is now just days away. To disqualify Baker & Daniels at this late date would severely prejudice ESI. Yet, the comparative prejudice to Welter if the motion to disqualify is not granted is minimal, given the extremely limited nature of the conflict.

Welter's explanation for the delay is unpersuasive. He asserts that he did not think a conflict existed until this Court disqualified Gillard. Comparing the alleged conflict of interest raised by Welter's motion to Gillard's conflict of interest is stretching the argument too thin. Gillard was disqualified because she was attacking her own work. Welter's motion attempts to string together a series of past representations on unrelated related matters and impute them to other lawyers in other firms. The principles of this Court's pre-vious decision do not necessitate granting the present motion. It is unreasonable to suggest that Welter did not know that Baker & Daniels's potential conflict might have merit until after this Court's decision disqualifying Gillard and her firm.

Welter waited too long to file his motion. He has waived his right to seek the disqualification of ESI's counsel, Baker & Daniels.

## III. CONCLUSION

Welter has not shown that Weaver worked for him on any substantially related matter from 1972 to 1985 and has not shown actual shared confidences sufficient to justify imputation of conflict from WW & B lawyers, through Weaver, to other lawyers at Baker & Daniels for work performed from 1985 to 1993. Weaver's work for Pleasant Street is not conflicting because Pleasant Street, and not Welter, was the client. Castille's involvement with the 1990 Executive Benefit Plan was merely peripheral, and it is unreasonable to assume that she received client confidences related to this case based on her limited amount of narrowly-focused legal research. Welter has also failed to show that Castille's work for E.W. Marine and her work for Welter on the 1992 repurchase of Fabwel was substantially related to the present case. Welter's argument related to Mills is too nonspecific and undeveloped to merit the disqualification of Baker & Daniels. Additionally, because Welter waited too long to bring this motion, he has waived his right to seek disqualification. Welter's motion to disqualify [Doc. No. 179] is **DENIED.**

**SO ORDERED.**